Madden, Judge,
delivered the opinion of the court:
This is a suit for damages for alleged breach of contract, brought by Mount Vernon, which had a contract with the United States, D and F, which had a subcontract with Mount Vernon, and L. C. L. and Windsor which had subcontracts with D and F. Since the plaintiffs other than Mount Vernon were not in contractual relation with the United States, none except Mount Vernon is eligible to bring this suit. Since, however, a prime contractor may, in proper circumstances, bring suit for the use and benefit of his subcontractors, we will treat this suit as such a suit by Mount Vernon.
Mount Vernon in March 1943 made a contract with the Government, which acted through the Army Corps of Engineers, to pave and drain a landing field at Newburgh, New York. The general grading of the field had been done during the previous year under other contracts. Under Mount Vernon’s contract there was excavation and grading to be *690 done, new runways and extensions of existing runways to be paved, and drainage to be constructed.
Mount Yernon subcontracted practically all the work. The subcontractors for excavation and for hauling and placing of gravel fill are not involved in the instant suit. Mount Vernon subcontracted the paving to D and F at unit prices per square yard of pavement and per barrel of cement. The subcontractors for excavation and for the placing of gravel were to prepare the base, within one inch tolerance, to receive the paving.
The excavation was, according to Mount Vernon’s contract, to be sufficiently deep to place a six- or eight-inch gravel fill subbase, in areas where the general grading of the previous year had made a cut, and a 12-inch gravel fill subbase where there had been a fill. That type of excavation was designated as Class A. Class B excavation was to be done where excavation to the Class A depths did not, under tests to be performed by the contracting officer, provide a sufficiently solid subbase. In such cases the contracting officer might direct deeper excavation.
As the work progressed, the soil was found to be very unstable in many places. The unstable areas ranged from small spots five or six feet across to areas 50 to 100 feet wide, 500 to 600 feet long, and as much as 15 feet deep. When the unstable material was removed, it was found to be unsuitable for fill, because much of it was hard clay and large rocks. At a conference between Mount Yernon and the Government’s resident engineer, it was agreed that such materials would be removed to spoil areas at an agreed increased price, and the excavated space would be filled with gravel at the contract unit price. It was hard to find sources for the enormously increased amounts of gravel. At one time the gravel contractor had 100 trucks engaged in hauling gravel.
The approved progress schedule showing the periods and sequence of the work, and a concrete paving chart were furnished D and F by Mount Yernon. The schedule provided for paving to be commenced May 14, 1943 and completed August 11, 1943. D and F erected its storage bins and batching plants, placed orders for crushed stone, sand and cement, and brought some equipment to the job, by May *691 14. Delivery of cement was commenced on June 3 and paving was commenced on June 8, when, for the first time, an area was ready for paving.
Because of the additional excavation and gravel fill work referred to above, no paving area sufficient for normal paving operations was ready until about September, 1943. The gravel subcontractor who was supposed to bring the base course to within one inch of the specified grade was careless about his grade and left large stones in the gravel. Extra work for D and F, disputes, and some delay in the paving operation resulted. Because adequate areas were not prepared in advance, D and F had to make frequent moves of its operations. On many occasions after the excavation had been done and gravel fill placed, additional soft spots would be discovered and further excavation made. Frequently D and F would have performed its finished grading, placed forms, and commenced paving when additional soft spots would be discovered and everything would have to be torn out.
On October 14, 1943, after all excavation had been done and most of the gravel had been placed on one of the taxiways, and it was substantially ready for paving, the Government determined to swing one end around several hundred feet from its original position. As realigned, it was not ready for paving until November 18.
D and F completed all of its paving about November 27, 1943, some 87 days later than it could have completed it if it had been able to proceed continuously. Some of this delay was due to a strike, and some was due to Mount Vernon’s failure to supervise and coordinate the work of its subcontractors, and to the failure of the gravel subcontractor to properly prepare the gravel base. Some sixty days of delay was, however, caused to D and F by stop orders and changes in the contract work, ordered by the Government, and resulting in delay in the preparation of areas for paving.
After the completion of the contract, the excavation subcontractor sued Mount Vernon because it had been required, by a change in the specifications agreed to between the Government and Mount Vernon, to waste the Class B excavation in the spoil area rather than use it as embankment fill. The *692 court awarded an increased unit price per yard, which, amounted to some $90,000, and Mount Vernon paid this amount. Thereupon, in April 1955, Mount Vernon requested an adjustment in the Class B excavation provisions in its prime contract. Modification No. 17 was issued on May 25, 1945, reclassifying a large part of the Class B excavation as Class C, and increasing the unit price per yard, the increase amounting in all to $49,596.82. There were other increases in Modification No. 17 not relevant here. Modification No. 17 was accepted in writing by Mount Vernon.
The delay of D and F’s paving work was, naturally, damaging to it. Its machinery was tied up on the job, its overhead and fixed charges went on for a longer period, and its efficiency was impaired. We have, then, a situation in which the prime contract, in Article 3, reserves to the Government the right to make changes in the work, within the general scope of the contract, and obligates the Government, if the changes cause an increase or decrease in the amount due under the contract, or in the time required for its performance, to make an equitable adjustment in the price and time. It further reserves the right, Specifications 1-05 (c) (1), to stop the work when conditions are determined to be unfavorable to its prosecution.
The Government makes changes in the amount and method of work with regard to excavation and the placing of gravel. The changes are necessary to make a safe landing field, but they delay the completion of the excavation and gravel work, and consequently delay D and F’s paving work. The Government pays the prime contractor for the increased yardage involved in the changes, and for the increased difficulty of the work done by the changed method. D and F still has the original number of yards of pavement to place and is paid the unit price for doing it. Its work has not been increased. It has only been delayed, to its damage. The stop orders did not change or increase anyone’s work. They only delayed it. We do not understand that either the change orders or the stop orders were unreasonable.
The Government relies upon United States v. Rice, 317 U. S. 61, and we think its reliance is justified. Bice was the receiver for a plumbing contractor, whom we will call P. *693 P bad a prime contract for the plumbing, heating, and electrical work for a veterans’ home which the Government was having built. Another contractor had a prime contract for preparing the site and constructing the building. The Government notified both contractors to begin work. Unsuitable soil conditions were discovered, the site of the building, and the specifications, had to be changed. P was not able to begin work until many months later than he had contemplated, and was damaged by the delay. P was paid the contract price for the work, and sued in this court for the damage caused by the delay. This court gave him a judgment. (95 C. Cls. 84.) The Supreme Court reversed. It held that the exercise of the Government’s contract right to make changes could not amount to a breach of contract, and that the contractor was given, by the contract, only the right to have the contract price adjusted in accordance with the change in the work, and to have additional time, if that was made necessary by the changed work.
D and F, as a subcontractor, is in no different position from what it would have been in as a separate prime contractor, as P was in Rice, or as Mount Yernon would have been in if it had done the paving work itself instead of subcontracting it to D and F.
We have limited our discussion to the situation of D and F. L. C. L. and Windsor, being subcontractors of D and F, are in no better position than D and F.
In view of our conclusion as to the legal merits of the claims presented in the petition, we do not consider or decide what was the effect of the releases given to Mount Yernon by D and F, L. C. L., and Windsor.
The petition will be dismissed.
It is so ordered.
Laramoee, Judge; Whitakee, Judge; LittletoN, Judge; and JONES, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner George H. Foster, and the briefs and argument of counsel, makes findings of fact as follows:
*694 1. Plaintiffs, Mount Vernon Contracting Corporation, hereinafter referred to as “Mount Vernon,” The Windsor Building Supplies Company, Incorporated, hereinafter referred to as “Windsor,” and the L. C. L. Corporation, hereinafter referred to as “LCL,” are corporations organized under the laws of the State of New York. Plaintiffs De Felice and Frione were copartners doing business as D &. F Construction Company, and are hereinafter referred to as “D & F.”
2. On March 25,1943, Mount Vernon and defendant, represented by United States Engineers’ Office in New York, New York, entered into a contract for paving and drainage of a landing field at Stewart Field, Newburgh, New York.
3. The contract was on a standard War Department contract form and contained the usual provisions for changes, changed conditions, delays, and disputes. It provided in Article 16 (d) :
Upon completion and acceptance of all work required hereunder, the amount due the Contractor under this contract will be paid upon the presentation of a properly executed ana duly certified voucher therefor, after the Contractor shall have furnished the Government with a release of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.
The contract also provided that the contractor should at all times employ an ample force of experienced, qualified workers to insure completion of the work within the time specified, and if the contractor failed to maintain a rate of progress which would insure completion of the work within 150 days after notice to proceed, the contracting officer might require additional men, equipment and plant to be placed on the work; and/or reorganization of plant and equipment layout would be effected in order to bring the work up to schedule.
Prior to submitting its proposal of March 19,1943, Mount Vernon had negotiated with L. G. DeFelice and D. V. Frione for the performance of. the concrete pavement. Under paragraph 4 of the standard Government form of pro *695 posal requiring information on subcontractors and tbe feature of work to be performed, the following note appears:
Concrete paying in case of award of combined Schedule I & II will be partially subcontracted to D. Y. Frione & Co., Inc., 87 Foxon Street, New Haven, Conn., brochure being separately submitted, and L. G. De Felis [sic] & Son, Inc., Nettleton Ave., North Haven, Conn., brochure on file, whose equipment list is attached to this proposal as being immediately available for either Schedule I & II.
Prior to making the award, DeFelice and Frione were called into conference by the area engineer held at his office at 120 Wall Street, New York, for a discussion and confirmation of their equipment available for paving. A list of their equipment was prepared by the area engineer on March 24, 1943, and was included in article 32 of the prime contract. All the equipment reflected by this list was restricted for use on the Stewart Field job only.
The subcontract of April 12,1943, with D & F contains the following paragraph:
The sub-contractor agrees that the items of equipment heretofore submitted by him in list form to the United States Engineer Office as available for use in the doing of the work, will be available solely for the use of the prosecution of the work which is the subject of this contract, and that he will utilize and keep available for use throughout the performance of the work each and every item of equipment so listed as long as needed.
4. The contract specified that the work to be done consisted of furnishing all plant, labor, and materials, and performing all work required for the paving of Stewart Field, Newburgh, New York, complete in accordance with specifications and drawings attached to the contract, together with such additional work as needed or ordered in writing by the contracting officer. The principal features of the construction consisted of grading, drainage, paving extensions of existing and new runways, and a compass swinging base. Performance was to be carried on concurrently with flying operations of the U. S. Army Air Corps, which necessitated that construction operations be carried on so that existing runway areas be kept clear for aircraft use. The contract also re *696 served to the contracting officer the right to suspend the work wholly or in part for such periods that due to unsuitable weather or other conditions were unfavorable to the prosecution of the work (Specifications 1-05 (c) (1).
The work was to be completed within 150 days after notice to proceed but such 150-day period was to be extended for any days of work suspension ordered by the contracting officer. There was no provision for the payment of liquidated damages by the contractor.
The specifications required the contractor to schedule all operations, making due allowance for the operations of the Air Corps, storms, and inclement weather so that he would be able to maintain the approved progress schedule. However, the work within restricted areas adjacent to the runways was to be constructed between May 27 and June 27, 1948, when these areas would be subject to a limited number of airplane flights per day.
The specifications also provided as follows :
Section II — ExcavatioN and Embankment. 2-01. General.
‡ H' ❖ ❖ ❖
c. Excavation will be classified as follows:
(1) Excavation Common.
(a) Excavation, Common (Class A) shall consist of the removal and final disposal of all materials necessary for all grading and construction of the paved areas, ditches and compass swinging, base. The cutting , of existing pavement for patching in order to conform with the new concrete pavement grades shall be considered as “Excavation, Common (Class A).”
(b) Excavation, Common (Class B) shall consist of the reconditioning of areas designated by the Contracting Officer prior to placing of gravel fill sub-base.
(2) Excavation, Trench, shall consist of the removal, backfilling or placing and compacting in embankment, or other specified disposal of all materials incidental to the construction of drainage structures, and the installations or removal and relocation of drainage pipe.
2-02. Construction Methods.
a. Excavation, Common.
(1) Class A. — The Contractor shall excavate any and all materials for all grading and construction of pavements, ditches and compass swinging base to the lines and grades shown on the drawings. Suitable excavated *697 material shall be used in the formation of embankments. The depth to be excavated shall be sufficient to place a 6" gravel fill subbase for Type A Pavement and 8" for Type B Pavement in cut areas and a 12" gravel fill sub-base in fill areas in addition to the depth of pavement to be constructed as shown on the drawings. Cut areas and fill areas will be the areas designated on the drawings and as directed by the Contracting Officer. Excess excavated material shall be disposed of in the areas noted on the plans as directed by the Contracting Officer. _ In areas where reconditioning is not essential as determined by tests performed by the Contracting Officer, the sub-grade shall be rolled to obtain the compaction specified in par. 2-02c.
(a) All topsoil and unsuitable material shall be removed as directed by the Contracting Officer. The unsuitable material shall be spoiled as directed by the Contracting Officer.
(b) In areas to be graded near Jackson Avenue where natural ground has to be graded, the topsoil excavated shall be stockpiled in windrows approximately 5 feet in height at designated locations within a distance of 2000 feet of the point of excavation as directed by the Contracting Officer.
(2) Glass B. — Where excavation to the grades does not provide a suitably compacted subgrade as determined by tests performed by the Contracting Officer, the excavation shall be continued for a depth of 12" or more, as directed by the Contracting Officer.
The existing subgrade material shall be excavated to depths required and if found satisfactory or similar to adjacent approved material, shall be placed back in the embankment in 6 inch layers and each layer compacted to give the compaction specified in par. 2-02c, Embankment.
5. Pursuant to Article 16 (d) of the contract, on November 29, 1944, plaintiff, Mount Vernon, executed a release to the defendant, reserving, however, “Any claims or suits by subcontractors presently existing or which may arise relating to the subject contract.”
Following the execution of this release, in April 1945, a suit which had been brought by the excavation subcontractor, N. D. Maselli Corporation, against Mount Vernon was concluded and Mount Vernon was held to have been obligated for an increased price for subcontract work. As a result, on May 25, 1945, a change order was issued designating a new *698 class of excavation, and the contract price was increased. After additional payments bad been made by defendant, Mount Yernon gave a new release to defendant on June 15, 1945, releasing all claims, “Except for the claim of the D & F Construction Co. for damages for delays filed by this corporation March 29,1945.”
6. On November 8,1943, D & F entered into an agreement with Mount Vernon which recited that certain claims, disputes, and differences had arisen between the parties thereto and that they desired to compromise and release each other from said claims. As a term of the contract, it was provided:
D & F hereby remises, releases and forever discharges Mount Yernon from any and all such claims for delay as aforesaid; it being understood and agreed, however, that this release shall not be construed to prevent D & F from presenting and filing with Mount Vernon a claim or claims for additional compensation for the extra work, expense and cost involved by reason of the delay or for any other reason, such claim or claims so presented and filed to be presented and made by Mount Vernon against the United States Government for allowance and payment by the said United States Government; in the event that such claim or claims so made and presented shall be disallowed in whole or in part by the United States Government, it is understood and agreed that D & F shall not have any recourse against Mount Yernon therefor, but shall be deemed to have surrendered such claim or claims under the release hereinabove recited; in the event that such claim or claims so made and presented should be allowed in whole or in part by the United States Government Mount Yernon, upon receipt of the proceeds of such allowance will pay over the same to D & F, less such amount or percentage of any such allowance the Government may allow Mount Yernon as the prime contractor as and for its overhead and profits, and Mount Yernon hereby agrees to cooperate with D & F in all reasonable manner in the presentation and collection of said claim or claims so presented by D & F.
In the above quotation the names Mount Yernon and D & F have been inserted in place of the terms “first party” and “second party,” respectively.
7. Windsor, under date of June 2, 1943, had entered into a contract with D & F to deliver the cement to be used in D & F’s paving operations. Said contract provided:
*699 In the event of delay in the performance of this contract, due to the action of the prime contractor or of the U. S. Government, through its agents, said delay causing loss to Windsor, such loss shall be claimed by D & F from Mount Vernon as a part of the whole loss claimed by D & F from Mount Vernon for delay arising from the actions of Mount Vernon or the U. S. Government, and Windsor shall be reimbursed therefor proportionately to the reimbursement received by D & F upon its claim against Mount Vernon and there shall be no other liability or responsibility of D & F to Windsor for such loss as may be claimed by Windsor for such delays.
The names of the parties have been substituted for the technical designations in the original.
8. LCL entered into an agreement dated April 22, 1943, with D & F to supply drop-bottom containers for shipment of cement to the job.
In an agreement, dated April 24, 1944, between LCL and D & F, it was provided that D & F would claim the losses asserted by LCL from Mount Vernon, that LCL would be reimbursed in the amount actually received by D & F upon that portion of its claim against Mount Vernon which referred to its claim against LCL, that D & F would use its best efforts to secure full payment of LCL’s claim, but that D & F had no other liability or responsibility to LCL for such losses.
9. On March 29,1945, Mount Vernon submitted a claim to the contracting officer on behalf of D & F in the sum of $209,497.54, LCL for $21,650.08, and Windsor for $16,337.02, all as claimed in the petition.
The contracting officer denied the claim in full, although no report of his determination or findings has been furnished in evidence in this case.
Mount Vernon , appealed the denial of the claims to the head of the department but was not represented at the hearing by counsel or otherwise. The claim came before the War Department Board of Contract Appeals, and the hearing was restricted to a motion of the Government for dismissal for lack of jurisdiction, and upon the following grounds:
*700 1. That the appeal does not involve a dispute oí fact;
2. That the appeal is one sounding in damages for alleged breach of contract by the Government, and
3. That the appellant has suffered no actual damage since it has been released by its subcontractor from any liability.
The motion by the Government was sustained and the appeal was dismissed. The opinion of the Board was rendered under BOA No. 1492, April 25, 1947, and was filed in this case as plaintiff’s exhibit No. 4.
10. Mount Vernon offered no evidence of any damages sustained by it in the performance of its contract with defendant.
11. The contract with Mount Vernon provided that work should start within seven calendar days after receipt of notice to proceed, and all work was to be completed within 150 calendar days after date of notice to proceed. Notice to proceed was given March 25, 1945. There was no provision for liquidated damages. The contract fixed a price of $3,412,823 which, however, was based on 60 items on a unit price.
Mount Vernon planned to and did subcontract most of the work under the contract. The excavation items were sublet to N. D. Maselli Corporation, and two other subcontractors were to do the hauling and placing of gravel fill.
The D & F subcontract was dated April 12,1943, and provided for the performance of all work under items 40,41, and 42 of the prime contract at a price of $1.2337 per square yard for the concrete pavement, $3.00 per barrel for High-early cement, and $2.30 per barrel for Portland cement, in accordance with the plans, drawings, and specifications pertaining thereto, and schedules prepared by the United States Engineer Office. It further provided that the general contractor would prepare the required subgrade within one-inch tolerance plus or minus of the required contract subgrade; and the subcontractor would thereafter do all necessary work involved in the preparation of the required fine grade to bring it to the true contract subgrade.
Subcontractor D & F, through Mount Vernon, on its own behalf and on behalf of Windsor and LCL, is seeking to re *701 cover damages from the defendant for delays suffered in the performance of the concrete pavement.
There were 17 modification agreements in connection with the contract involved herein, five of which cover the rental of Government equipment for use in its performance. Other modifications relating to changes in the contract work are listed below:

Stop orders totaling 16 calendar days up to July 27, 1948 extended the original contract period to September 7, 1943. Since change orders were generally issued after the change was orally ordered in the field, it is not determinable whether or not the delays by stop orders were included in the additional time allowed in the modification orders.
Contract performance items were increased from 60 to 127 by modifications. Most of the additional items covered drainage work, including asphalt concrete surface course for gutters of $69,000 and grading additional areas not covered by excavation under the contract for a lump sum of $63,462.74. The contract excavation and gravel fill were increased as follows:

*702 Gravel fill brought in from approved pits beyond the 7-mile limit specified totaled 530,000 cubic yards, of which 250,000 cubic yards were paid at an increased price of 20 cents and 280,000 cubic yards were paid at an increased price of 14 cents per cubic yard.
Gravel fill under the original contract consisted of two items: item 6, gravel fill subbase of 810,000 cubic yards at $1.35 and item 7, gravel fill for gutter areas of 29,000 cubic yards at $1.50 per cubic yard. Item 7 was deleted from contract requirements. Other gravel was increased to 741,000 cubic yards by the use of gravel fill as backfill for trenches and substantial portions of the embankment below the grade levels of the gravel fill subbase.
Class B excavation, which consisted of excavation below the subgrade for 6-inch, 8-inch, and 12-inch gravel fill courses under the paving areas was originally estimated at 450,000 cubic yards at $0.55 per cubic yard. It was increased to 571,266 cubic yards because of unsatisfactory sub-grade conditions found in larger areas and greater depth than had been anticipated. Modification 17 provided for the payment of 506,090 cubic yards of this excavation at $0,648 per cubic yard by reason of the fact that it was determined unsuitable by the contracting officer and was hauled to waste areas, as hereinafter reported. (Finding 19.)
12. There was no change in the original estimate for concrete paving performed by D & F. Neither was any allowance made in the unit price of such work by reason of increased costs reasonably attributable to delays resulting from performance, conditions, and the modifications of other items of work which preceded the placing of concrete pavement.
Neither the plaintiffs nor the defendant furnished any record of the final payment estimate, nor was any other evidence furnished whereby the actual amount paid the prime contractor for the various items of work could be determined.
13. Concrete pavement included the following items of the prime contract schedule:

*703

The concrete paving areas covered extensions to each end of four principal runways, some eight taxiways and a large “mat” area covering the intersection of the north-south and east-west runways, approximately 2,000 feet square. The runway extensions required pavement 150 feet wide and the taxiways from 50 to 100 feet wide. The concrete pavement was generally 6 inches thick but was graduated to a thickness of 8 inches along the edges of the pavement.
The actual performance was approximately 716,487 square yards of concrete pavement and about 198,000 barrels of cement. Most of the concrete paving was in the mat area, which required approximately 380,000 square yards, exclusive of the intersecting runways. All of the concrete pavement was completed by November 5, except the O-E taxiway, which was completed November 27, 1943.
14. Pursuant to the requirements of the specifications, the prime contractor submitted its proposed progress schedule March 28,1943. It was discussed with the contracting officer who suggested certain changes, and a revised schedule was thereafter issued April 7,1943, which was approved by him.
The approved progress schedule, showing the sequence and periods of the work, and a concrete paving chart were furnished D & F by Mount Vernon. The concrete paving was indicated to be commenced May 14,1943, and to be completed August 11,1943. D & F erected its storage bins and batching plants, placed orders with suppliers for crushed stone, sand, and cement, and brought to the site a substantial amount of equipment by May 14. However, its first paving unit arrived on the job about May 19, a second unit arrived about June 16, and the third unit did not arrive until June 24. The delivery of cement to the site was commenced June 3,1943.
*704 Concrete paving areas had not been prepared by May 14 and a sufficient area was not ready until about June 8,1943, when concrete paving was commenced.
D & F could have reasonably commenced its paving operations on June 4,1943, and could have completed the concrete pavement within the 90-day period provided in the progress schedule, except for the delays hereinafter reported.
15. The grading of the landing field had been performed about a year earlier by three contractors. A hill had been cut down and lower areas filled for the extensions of the runways, taxiways, and the mat area. The previous work consisted of rough grading and it was anticipated that portions of the fill area would have to be removed and replaced for proper compaction, particularly under the paving areas.
Approximately two weeks after the excavation work was commenced, it was discovered that substantial areas of the subgrade would require B excavation because of its unstable condition. The material excavated was not satisfactory for re-use in the embankment fill. It consisted of hard clay and contained numerous large rocks. On April 19, 1943, the contracting officer, his assistant, and the resident engineer met with representatives of the prime contractor and it was agreed that, because of the condition of the subgrade material being excavated and the difficulty in reconditioning it for compaction as fill, the materials excavated under the pavement areas would be removed to spoil areas at a price of $1.10 per cubic yard instead of the bid price of $0.55. It was further agreed that run-of-bank gravel would be placed in 6-inch layers at the contract unit price as backfill for the embankment areas excavated, and that backfill in other areas could be accomplished by tractors or bulldozers with a credit of 15 cents a cubic yard to the Government. No change order, however, was issued for the hauling and disposition of the wasted materials from B excavation until after the completion of the contract. (See finding 19.)
Because of the lapse of time necessary to permit the excavated material to dry for proper compaction as backfill in the embankment, it was more expeditious to have such material wasted and fill back with gravel. Gravel backfill *705 was ordered to be placed within 24 hours after a satisfactory subgrade was established. The prime contractor’s superintendent understood that it would be less expensive to waste the B excavation than to recondition it and replace it as backfill, although he never knew what his excavation subcontractor’s costs were.
16. The use of gravel as embankment fill greatly increased its requirement over contract estimates. (See finding 11.) By April 28,1943, three gravel pits had been tested and approved by the Government as sources of supply. Because, however, of the great need, other sources were submitted by the prime contractor; and much of the gravel from approved pits was condemned because it was not uniform in quality. By June 1, gravel was being hauled from the Moodna pit which was beyond the 7-mile limit of the construction area. By June 16 only two approved pits were available, the Crist pit and the Jackson pit. The prime contractor had submitted 10 pits for gravel, and the material from all except one of them had been rejected from time to time. Mount Vernon was continually seeking new sources of gravel. Most of the gravel was obtained from pits outside of the 7-mile limit of the construction area.
By reason of the increased requirements and longer hauls for gravel fill, the gravel subcontractor was required to increase his hauling equipment. On June 1,1943, 33 trucks were employed, five of which were engaged in spoiling unsatisfactory material at the pits; by June 9 the gravel subcontractor had 52 trucks, and by July 17 he had 100 trucks engaged in hauling gravel.
The excavation and gravel fill work was not completed sufficiently in advance for normal paving operations until about September 1943. The area engineer continued pressure for additional gravel by increasing equipment or working hours, but by July 17 when approximately 100 trucks were employed, the gravel subcontractor was unable to obtain additional operators for additional trucks or to operate a second shift.
On July 21, 1943, D & F asked permission to shut down the concrete paving for a period of two weeks in order to allow time for the preparation of the subgrade and gravel *706 fill, but this was denied. On one occasion, D & F threatened to abandon its work and remove its equipment from the job, but the area engineer posted guards to prohibit the removal of any equipment without the approval of the contracting officer.
On July 23, 1943, D & F complained to the area engineer of the delay in its paving operations, lack of supervision on the part of the prime contractor, negligence on the part of Government inspectors, and requested adjustment of its costs for overhead expense. It was advised that the supervision of the work was the responsibility of the prime contractor and that any claim for delay should be lodged against the prime contractor.
17. Mount Vernon depended upon the subcontractors to coordinate their work. It kept no diary of the daily activities on the job, and the daily record of the resident engineer was not available. There was a lack of proper supervision on the part of the prime contractor, and considerable friction between the prime and subcontractors and among the subcontractors themselves.
The subcontractor for gravel fill was required to compact the gravel fill but was required to bring the base course only within one inch higher or lower than the specified grade, and the subcontract with D & F required it to perform the fine grading and bring the grade level within that specified of one-half inch tolerances. The gravel subcontractor became careless in approximating the grades required and also left large stones in the gravel, failing to properly place and prepare it for the paving subcontractor. This resulted in disputes and some delay to the concrete paving operation.
The area engineer held weekly meetings from the beginning of the job which were attended by his assistants, the representatives of the prime contractor, and all of the subcontractors for the purpose of coordinating the work and expediting its progress. Government representatives on the site issued stop orders to the paving contractor’s employees and directed their work from day to day. D & F was required to move its paving operations from time to time and sometimes several times a day.
*707 18. D & F planned to place the concrete pavement in accordance with the plan- and sequence of the approved progress schedule for this work. Concrete was formed and placed in 25-foot lanes. Each runway required six lanes of concrete. The mat area required 74 lanes, exclusive of the. runway that traversed it.
In the preparation of the subgrade, the Government representatives on the job would order class A excavation,, that is the materials excavated to the original subgrade for placing the gravel base, and then stopped the excavation for testing the area, although certain spots were visibly unstable and obviously required further excavation. Then certain soft spots were ordered removed and further inspection was made and excavation was extended. This continued from day to day and sometimes these spots were extended many times the original area determined unsuitable. Such practice continued until July 28, 1943, when class B excavation was ordered to be carried down three feet below the bottom of the gravel subbase.
On many occasions, after the gravel fill and base course had been placed, additional soft spots would be discovered and had to be re-excavated. Frequently D & F had placed forms, performed its finished grading, and commenced paving, when additional soft spots would be discovered, necessitating the removal of the forms, re-excavation of material previously placed, and the moving of the paving contractor’s equipment.
Subgrade areas requiring class B excavation ranged in size from small spots five or six feet across to areas 50 to 100 feet wide, 500 to 600 feet in length, and as much as 15 feet iii depth.
Continual trouble was experienced with stabilizing the subgrade until about the end of August 1943. The subgrade of the mat area was very poor, and large areas were excavated. Paving was frequently stopped for re-excavation- and supplies and equipment were moved from place to place as the preliminary work was approved. When paving was. stopped in a lane being paved, bulkheads were installed at. the cutoff point.
*708 Where material, previously placed, was re-excavated, no deduction was made in the quantity of material handled, unless it was determined that the original work was improperly performed. No instance was cited, however, where such a deduction was made.
19. Modification No. 12, dated August 12, 1943, provided for a price of 68 cents a cubic yard for both class A and class B excavation in the triangles. It also provided for additional drainage installations in the triangles. An allowance of 45 calendar days of additional time was authorized for the work specified in this modification.
At the end of August, Maselli, the subcontractor for excavation, stopped work and threatened to move his equipment from the job because of the depth of the excavation required and because the Government denied the use of this material as backfill, necessitating the hauling of this excavation to spoil areas. On September 2, 1943, the prime contractor served notice that Maselli could file a claim for extra work but that excavation was to be continued immediately by the prime contractor and that unless Maselli resumed his contractural obligations within three days, he would be liable for damages for delays to the paving contractor. The resident engineer recognized certain types of excavation performed that could not be classified as class A or B, but which he classified as class X excavation.
After the completion of the contract operations, suit was brought against Mount Vernon by its excavation subcontractor because of a change in the specifications for class B excavation, requiring the waste of this excavation in spoil areas rather than replacing it as embankment fill. The court which heard the case rendered judgment against Mount Vernon and required the payment of $0,648 a cubic yard for 506,090 cubic yards of excavation previously classified as B, which was $0,178 a cubic yard in excess of the subcontracted rate of $0.47 a cubic yard, resulting in an increased payment by Mount Vernon in excess of $90,000. •
On April 23, 1945, Mount Vernon’s president telephoned the successor contracting officer and requested an adjustment in the class B excavation in the prime contract.
*709 Modification No. 17 was issued May 25, 1945, which, reclassified 506,090 cubic yards of the class B excavation to class C excavation at $0,648 per cubic yard, or an increase of $0,098 per cubic yard over the prime contractor’s price of $0.55, or a total increase on this yardage of $49,-596.82. The increase in the contract price of $116,293.12 by this modification was due in part to an increase in the quantities performed over the contract estimate for class B excavation other than excavation in the triangles.
The performance period was extended 45 calendar days by modification 17.
20. There was a sympathetic strike of all workers on the Stewart Field job starting about August 16, 1943, which lasted about two weeks. There was no dispute with workers on this job, but the dispute arose between a contractor at Montgomery Field and the union.
21. At the weekly meeting of September 24,1943, the resident engineer was directed to check the grades on the O-P taxiway and the gravel subcontractor agreed to prepare this taxiway for concrete pavement as soon as possible. It was also decided that the O-P taxiway would be concrete to station 2+15 and between this point and the intersection of the NW-SE and NE-SW runways, it would be constructed with type B pavement (bituminous) at the same time as the adjacent existing pavement was being resurfaced. The O-P taxiway was the principal taxiway, connecting the main intersections of the runways and the parking area.
Thereafter, the Government determined to change the alignment of this taxiway and swung one end around several hundred feet from its original position, changing the designation from O-P to O-B taxiway. By letter of October 14, 1943, to Mount Vernon, the area engineer directed the performance of this change. The letter read as follows:
On 5 October 1943 ten (10) copies of each of the following revised drawings were forwarded to your office:

*710

In accordance with the provisions of Paragraph 1-36, Minor Modifications, of the contract specifications, the work indicated in the above revised drawings shall be performed at no change in the contract unit prices and/or time.
By the time the Government had notified Mount Vernon of the proposed realignment of this taxiway to O-R, all excavation had been completed, gravel had been largely placed, and it was substantially ready for the placing of the concrete pavement. The contract unit price was paid for work performed on the O-P taxiway as well as the additional work performed on the O-R taxiway as changed. The O-R taxiway, however, was not ready for the concrete pavement until about November 18, 1943. D & F had completed all other concrete pavement by November 5 and its work was shut down for approximately two weeks. DeFelice protested orally to the area engineer who agreed that the delay would be paid for. No modification was issued for the change in the O-R taxiway and D & F was not otherwise compensated for its delay. All concrete pavement was completed about November 27, 1943.
22. D & F was prepared to commence the concrete paving by June 4,1943, and could have completed all paving specified by September 1, 1943, except for the delays in areas made ready for its work. D & F was delayed an over-all period of 87 calendar days.
The contracting officer recognized that additional time was required and granted 45 days for the performance of class A and B excavation and certain drainage work in the triangle areas by modification 9; and 45 additional days under modification 17 for excavation which was reclassified *711 as class C that was hauled to spoil areas. The quantity of gravel iill placed was more than twice the amount estimated under the original contract. At least 16 days of delay were attributed to stop orders issued by the Government representatives, and 14 days were attributable to the relocation of the O-R taxiway.
A strike of all employees delayed the work approximately 14 days in August 1943, and work stoppage by the excavation subcontractor delayed the work that followed approximately two days. There was an indeterminable amount of time lost to D & F by reason of the lack of supervision on the part of the prime contractor and the failure of the gravel subcontractor to properly prepare the gravel base course within the tolerances agreed upon for that work.
A reasonable determination is that D & F was delayed at least 60 calendar days by reason of stop orders issued by the Government and changes in the contract work which required performance before concrete pavement could be placed.
23. The claim for damages by D & F is based upon its loss in performance of $93,107.04, and consists of a computed loss of $108,712.20 on paving, less credits for discounts on purchases and sale of materials and a profit of $11,150.65 on cement furnished. D & F has included in performance costs certain items which have been determined to be erroneous charges, however, or credits and other items improperly allocated as follows:
(a) An invoice of the Flexible Road Joint Machine Company for $9,798.40 was settled for $7,764.67, with a reduction in costs of $2,033.84.
(b) One half of corrective work performed in July 1944 at a cost of $361.48 was back-charged to the Railroad Weather Proofing Company which performed the original work, reducing such costs by $180.74.
(c) An error in the payroll take-off resulted in an increase in labor cost of $37.55.
(d) Substantially all of the equipment employed by D & F in the performance of its subcontract was owned by the D. V. Frione Company and L. G. De Felice & Son Company, and D & F paid them rental at approximately 10 percent under the prevailing OPA rates. After the work was completed the owners submitted to D & F invoices dated January 28, 1944, totaling $68,085.50, based upon an estimated cost of repairs as follows:

*712
DeFelice <& Son Frione Co.

Estimated cost of repairs_$14,319.00 $16, 968. 00
Rental for two months while under repair_ 17,180.40 19, 618.10
These invoices were not paid by D & F and in any event are not properly chargeable as performance costs. _
_ (e) The job superintendent’s expenses included items for entertainment of $892.95, not properly chargeable to performance.
(f) Engineering services by Eaton J. Claghn claimed at $3,600 was settled for $1,000 but was not adjusted in the books of account which reduced such costs by $2,600.
(g) Legal expense of $9,000 for fees billed during 1945 for services in connection with the D & F claim for damages were improperly included in costs by D & F. Other legal fees totaling $5,150 were recognized by the Government auditor as reasonably applicable during performance.
(h) Traveling and entertainment charges by De Felice and Frione were included in D & F costs in the sum of $6,278.05. For the most part there was no supporting evidence of what constituted these charges. One invoice by DeFelice, dated January 3, 1944 was for $3,087.48 for his expense during the period April 1 to December 31, 1943. They are properly excluded from performance costs.
(i) D & F included $5,400 each to DeFelice and Frione as general officers’ salaries. They were also partners in D & F, having organized the partnership. Joseph DeLucia was employed as project manager to supervise the work. D. V. Frione attended one of the weekly meetings held by the area engineer on June 16, 1943, but there is no evidence that he was otherwise actively engaged on the work. A reasonable allowance for general supervision is one salary of $5,400.
. (j) Advertising of $100 was improperly included as an item of cost.
24. D & F performance costs of concrete pavement under its subcontract are summarized in the following tabulation with allocations separately shown for the cost of cement and paving operations:

Costs Concrete paving Cementfurnished

1. a. Direct labor_ $126, 237. 75 $6, 739. 38
b. Payroll insurance and taxes_ 18, 807. 38 1, 012. 08
2. Construction materials_ 370, 355. 59 377, 730. 24
3. Construction supplies, services and transportation expense_ 49, 843. 32 1, 964. 08

*713
Costs Concrete paving Cement furnished

4. Subcontracts_ $149, 796. 62 $30, 161. 29
5. Equipment rental_ 130, 657. 75 12, 856. 91
6. Plant erection and moving in and out:
a. Labor_ $5, 217. 79
b. Payroll insurance and taxes_ 783. 58
c. Supplies_ 155. 76
d. Transportation_ 16, 852. 11
Total. 23, 009. 24 20, 708. 32 2, 300. 92
Subtotal_ 865, 406. 73 432, 764. 90
7. Job overhead: allocated on direct labor basis_ (94 9%) (6. 1%)
a. Salaries, supervision and timekeepers. 16, 800. 34
b. Telephone and tele-graph_ 1, 642. 29
c. Maintenance, pickups and passenger cars_ 3, 429. 33
d. Gas, oil and grease. 741. 73
e. Superintendent’s ex-pense_ 5, 249. 35
f. Temporary field quarters_ 1, 293. 54
g. Minor supplies_ 1, 332. 71
h. Stationery and office supplies_ 627. 14
Total_ 31, 116. 43 $29, 529. 49 $1, 586. 94
Total performance costs_ 894, 936. 22 434, 351. 84
8. Nonoperating expense:
a. General salaries_ 5, 400. 00
b. Legal expense_ 5, 150. 00
c. Accounting and engineering_ 3, 500. 00
Total_ 14, 050. 00 9, 455. 65 4, 594 35
Total contract costs_$904, 391. 87 $438, 946. 19

Receipts

Paving:
716,487 sq. yds. @ $1.2337_$883, 930. 01
Purchase discounts and miscellaneous
sales. 4, 454. 51

*714
Concrete Cement Receipts paving furnished

Cement furnished_ $456, 379. 90
Total receipts_ 888, 384 52 456, 379. 90
Net loss on paving operations_ 16, 007. 35
Net profit on cement furnished_ $17, 433. 71
The performance loss on its paving operations is not a reasonably accurate measure of increased costs to D & F by reason of delays experienced in the performance.
D & F had certain continuing expenses which had a direct relationship to the period of performance, such as equipment rentals, job supervisory, and nonoperating overhead expenses. D & F commenced preparatory work in April 1943 and by May 14 it had a substantial amount of equipment ready for operations, although its cement deliveries did not commence until June 3, 1943. A reasonable period of continuing expenses for equipment rentals and overhead was from May 15 to November 30, 1943, or a period of 200 calendar days. The average daily rate of these expenses were as follows:

Amounts Daily

Equipment rentals_$143, 514.-66 $717. 57
Job supervision_1_ 16, 800.34 84.00
Telephone and telegraph expense_ 1,. 642.29 8. 21
Nonoperating overhead expense_ 14, 050. 00 70.25
Total-$176, 007.29 $880.03
A fair and reasonable determination of increased costs for 60 calendar days of delay in performance is $52,801.80.
25. An agreement was entered into between D & F and Windsor dated June 2, 1943, whereby Windsor agreed to deliver an estimated 263,000 barrels of cement from the Maybrook, New York, siding of the New York, New Haven, and Hartford Railroad, to the D & F storage bins at the site of construction on Stewart Field at a price of $0.15 per barrel of 376 pounds.
This agreement ■ contained the representation by D & F that it had an agreement with the New York, New Haven, and Hartford Railroad whereby the railroad would install facilities at the Maybrook terminal, consisting of a siding, approaches, and driveways suitable for placing about eleven cars a day with adequate trackage for empties and *715 other space for loading of trucks; and that switching services would be provided for loaded or empty cars up to a maximum of three switches a day, seven days a week. D & F further agreed to use LCL drop-bottom containers exclusively for the shipment of the cement from its suppliers.
The agreement also provided that deliveries would be commenced about June 5, 1943, and continue for approximately 90 days as cement was needed by D & F and Windsor agreed to work a 7-day week, if necessary, without additional compensation.
The agreement further stipulated that, in the event of delay by the prime contractor or the United States with a resulting loss to Windsor, such loss would be claimed by D & F from the prime contractor or the United States and any recovery thereon would be reimbursed to Windsor; but that D & F would not be otherwise liable or responsible for such loss.
26. The LCL Corporation confirmed an agreement by letter of May 12, 1943, to Windsor, that LCL drop-bottom containers would be provided and delivered at the Maybrook siding which was to be constructed by the New Haven railroad in a manner satisfactory to Windsor; that LCL would pay Windsor $0,035 per barrel to cover the cost of unloading the containers by crane; that LCL would provide two cranes for handling the containers, one of which would be a standby crane, and agreed to deliver these cranes f.o.b. at Campbell Hall and that L & F would be responsible for the delivery of the cranes to the proper location at Maybrook, in line with LCL’s agreement with D & F.
Thus, Windsor was compensated in part by D & F for the delivery of the cement, and in part by LCL for the operations of a crane which was necessary for unloading the bulk cement in LCL containers from railroad cars adapted to carry these containers.
27. Sometime after the completion of its contract for the delivery of cement, Windsor prepared a statement of its claim for $16,337.02, represented by an operating loss of $13,705.96 and a loss of anticipated profit of $2,631.06. The operating loss was determined without regard to income of *716 $7,032.59 received from LCL for unloading the cement in LCL containers by crane.
28. Windsor received the sum of $37,172.33 for its services.It was paid $30,139.74 by D & F for the delivery of 200,931.49 barrels of cement by truck from Maybrook to Stewart Feild at $0.15 a barrel, and $7,032.59 by LCL for unloading a like quantity of cement from LCL drop-bottom containers by cranes suitable for handling these containers, at $0,035 a barrel.
Windsor claimed total costs of $43,850.93, represented by job performance costs of $39,864.48 plus 10 percent for overhead. Its work covered the period June 3 to November 23,1943.
Windsor provided certain additional facilities at the May-brook siding for handling the cement in bulk and loading the trucks which were amortized at 50 percent of the costs to this job. It failed to include a partial payment on April 26, 1943, of $400 on certain bins that were purchased for this job, which would increase such charges by $200. It also failed to include a telephone bill for $2.70. On the other hand, a substantial amount of charges making up its costs are determined to be improper or erroneous:
(a) Minor errors, eliminations of costs applicable to other jobs and discounts on purchases amounted to $84.20; also, the payment of $80.50 for the loss of 35 barrels of cement due to a truck accident, properly chargeable to Kelly & Morris, who were subcontractors for hauling the cement at $.08 a barrel.
(b) After the completion of the job, Windsor recorded in its purchases analysis journal and included in its costs the following items under date of November 30, 1943:
Cost of removing plant and cranes- $219. 81
Henry Malo — Plant erection labor- 225.00
Henry Malo — Additional salary:
June 3 to 17,1943, @ $90 per week — - 180.00
June 3 to Nov. 24, 1943, @ $80 per week_ 2, 000.00
Henry Malo — Subsistence allowance-- 882. 51
Henry Malo — Gasoline for cranes_ 286.10
Henry Malo — Auto mileage allowances- 456.00
Total. $4,249.42
*717 The cranes were not the property of Windsor, bnt were owned by the New York Central Railroad and rented by LCL, and Windsor had no responsibility for their removal; also, the 50 percent amortization of Windsor’s plant costs would reasonably cover its removal. There were no vouchers covering the entries for Malo. Mr. Malo was the superintendent for Windsor on this job and was regularly paid a salary of $90 for a 6-day week from June 17, 1948, plus certain items of expense.
Malo was also paid $3,666.06 by Windsor for trucking services and expense on the Montgomery job during the period August 4 to November 24, 1943. There is no satisfactory evidence to justify the above charges against Windsor’s cement hauling contract.
(c) Windsor also included in its cost of performance $5,720 as crane rental, represented by an invoice from LCL dated January 14,1944, for the use of crane T-3 from June 3 to December 11, 1943, excluding Sundays, 191 days at $20 a day amounting to $3,820, and standby crane T-4 for 190 days at $10 a day amounting to $1,900.
This invoice was issued by LCL without recording it upon the books, on written instructions of the president of LCL to its treasurer. Officials of both the LCL and Windsor knew this was not a proper charge to Windsor, since LCL had not only agreed to provide the cranes, but to pay Windsor 3y2 cents a barrel for the operation of the cranes in unloading the LCL drop-bottom containers; and LCL had made payment in full for this account by December 1, 1943.
Prior to the conclusion of hearings in this case, Windsor issued its certified check dated September 27, 1954, to LCL for $5,720. On the basis of evidence introduced earlier that the standby crane had been used during June 1943, at the Arborie batching plant where Windsor had another job, LCL issued its certified check dated September 29, 1943, to Windsor for $270 to adjust charges for 27 days in June 1943, when T-4 crane was not available for unloading cement. Of course, these checks do not change the nature of this charge nor the original intent of the parties.
*718 (d) Windsor applied payroll insurance and taxes at approximately 14 percent of its labor. Insurance invoices for its cement hauling contract for workmen’s compensation ;and public liability averaged approximately 5.2712 percent, social security taxes were 3 percent for unemployment, and 1 percent for FOAB, aggregating approximately 9.2712 percent of labor.
(e) General administration expense over the period of performance of this job from June to November 1943, inclusive, was 8.98 percent of performance costs on all jobs, instead of 10 percent applied in Windsor’s claim.
29. Windsor realized a net profit of $5,398.67 as determined in the following tabulation:
Receipts _ $37,172.33

B árpense

Plant and erection, less salvage_ $2,140. 86
Gasoline and oil used in crane- 607. 00
Telephone_ 120. 79
Miscellaneous supplies and superintendent’s expense_ 284. 26
Trucking, 200,908.13 barrels @ $0.08- 16, 072.68
Labor to operate plant_ 9,087.39
Payroll insurance and taxes @ 9.2712%- 842. 52
Total- performance costs- 29,155.50
General overhead expense @ 8.98%_ 2,618.16 - 31,773. 66
Net earnings on cement hauling job_ $5,398. 67
Windsor regularly employed one crane-operating engineer, one oiler, and one or more laborers who were paid at hourly rates. Windsor also employed one superintendent at a fixed salary of $90 a week, representing a continuing job expense. The work overran the anticipated performance period by approximately ten weeks. Trucking was performed as cement deliveries were received at the railroad terminal. However, the evidence is incomplete and unsatisfactory for a determination as to whether or not any portion of the delay in the completion of the cement trucking was attributable to delays on the part of the Government at the site of construction; the failure of D & F to provide adequate *719 storage; or its inability to obtain cement deliveries more promptly.
30. In 1943 LCL owned 1,080 drop-bottom containers, acquired during tbe period 1934 to 1942 for use in shipping bulk cement. They were employed in units sometimes referred to as container cars, consisting of 12 drop-bottom containers to each car. The rolling stock was owned by the railroads, but LCL owned 90 container cars which were placed on railroad cars when in. use. These units or container cars were then leased to railroad carriers for the shipment of bulk cement, under agreements with LCL for compensation, usually at 20 percent of the gross freight received by such carriers. Each of these drop-bottom containers would carry almost five tons of bulk cement, which necessitated the employment of a crane to handle them.
LCL had no prior agreement with the New. Haven railroad, which was the final carrier for the delivery of cement at Maybrook, New York. By a special agreement with the New Haven railroad, LCL agreed to accept ten percent of its proportion of the freight earnings for hauling the cement in LCL bulk containers, which was only one-half of the usual rental under leases with other railroads; but the New Haven railroad agreed to construct a siding and the necessary driveways and approaches satisfactory to D & F and to Windsor, who would perform the unloading and hauling of the cement.
LCL never had a contract or formal agreement with I) & F. Graham C. Woodruff, president of LCL, however, had negotiated with DeFelice for handling the cement requirements of D & F in LCL containers on the premise that a saving of four cents a barrel in freight could be realized by so doing. A proposal, which was outlined in a letter in reference to this matter, dated April 22, 1943, from LCL to DeFelice, was approved by D & F May 4, 1943. This letter stipulated that the New Haven railroad proposed to put in a siding at Maybrook and pay LCL ten percent of its earnings for hauling the bulk cement in LCL containers, and in consideration of LCL accepting the ten percent from the New Haven railroad which was one-half the normal usage charge, D & F would pay LCL a flat $2,000 instead of paying *720 for the construction of the siding. It further stipulated that D & F would ship all its cement in LCL containers and would include this provision in its purchase contracts with suppliers; and that it would buy cement from concerns on railroad lines having agreements with LCL so that LCL would collect the normal usage charge for its containers from all carriers other than the New Haven.
Thus, LCL was compensated for the use of its bulk containers by the railroads, except for the reduction in the normal usage rate to the New Haven railroad, which was offset by the flat payment of $2,000 by I) & F to LCL.
The only direct cost to LCL under its multilateral agreements was its payment to Windsor of $.035 per barrel for unloading the containers and the furnishing of suitable cranes for this purpose.
LCL rented two cranes with 55-foot booms, from the New York Central Kailroad. It paid $6.00 a day for each day that a crane was used. Crane T-3 was delivered and accepted at Newburgh, New York, instead of Campbell Hall, on or about May 24, 1943. Crane T-4 was delivered to the Maybrook siding about July 1, 1943, as a standby crane upon the completion of its use by Windsor on another contract at Steward Field.
Cement was delivered at the Maybrook siding from June 3 to November 22, 1943, in 652 container carloads.
31. By invoice dated January 6, 1944, to D & F Construction Company, LCL claimed $21,650.08 for “Loss sustained by the LCL Corporation in contract dated June 2, 1943, for Transportation of Cement Account Stewart Field.” LCL predicated its claim upon Windsor’s subcontract with D & F which stipulated cement requirements of approximately 263,000 barrels and the delivery period of approximately 90 days.
A letter of agreement dated April 24,1944, by D & F and its acceptance on May 1, 1944, by LCL, constituted a settlement of this claim insofar as it concerned D & F. It provided in part that D & F would claim such loss from the prime contractor or the United States and would reimburse to LCL any recovery received upon the claim of LCL; and that D & F had no other liability to LCL for such loss as *721 might be claimed by LCL and the acceptance of its letter “shall be construed as full and complete settlement in and for the matter referred to.”
The claim of LCL was included in the prime contractor’s claim of March 29, 1945, and was denied in full under BCA No. 1492, April 25,1947.
32. The claim of LCL is wholly hypothetical, premised on the theory that it could have delivered the cement in 90 days by the allocation of 40 container cars for this purpose and that 262,000 barrels of cement would have constituted 873 carloads, representing 21.825 round trips for each car in use, or 7.275 carloads a month for each carload. A summary follows:
Computed earnings:
Earnings for 90-day period, 873 cars @ $21.71_$18, 956. 00
Earnings for 80-days or 2% months after the 90-day period for 40 cars allocated to the job at $157.96 per month ($21.71X7.275 carloads)_ 16,849.00
Total- 35,805.00 Actual earnings:
Delivered 652 carloads at $21.71 per carload_ 14,154. 92
Difference claimed_$21, 650. 08
There is no evidence that LCL container cars could have delivered 7.275 carloads a month each. To the contrary, the unloading record, filed in this case as plaintiff’s exhibit 21 shows that 84 cars were employed up to September 4, 1943, and that only one car made a maximum of nine deliveries, two made eight round trips, and six made seven round trips, or carloads delivered over the 90-day period. They averaged 4.1 carloads each over the 90-day period and delivered 344 carloads.
There were 652 carloads of container cars of bulk cement delivered for which LCL received from the carriers $15,377.33, or an approximate average of $23.58 per carload. LCL also received $2,000 payment by D & F, making total receipts of $17,377.33.
LCL paid Windsor $7,032.59 unloading costs (200,931.49 barrels @ $0.035) and $702 for crane rental for 117 days’ usage at six dollars a day. Its gross income for the usage of *722 its bulk cement containers on this job was $9,642.74. There is no evidence of the proper allocations for depreciation and administration expense to this work.
The only item of continuing expense to LCL was its crane rental which overran the estimated delivery period by 27 days. There is no satisfactory evidence that this overrun was attributable to delays in performance at the site of construction.
CONCLUSION 0E LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is therefore dismissed.